AUSA: Ryan Particka Telephone: (313) 226-9635

AO 91 (Rev. 11/11) Criminal Complaint Inspector: Darryl Sage Telephone: (313) 226-8246

# UNITED STATES DISTRICT COURT

for the

Eastern District of Michigan

United States of America
v.
Alexandre Y. Khomoutov

Case No. 26-30581

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of March 2022 - Present in the county of Oakland and Elsewhere in the Eastern District of Michigan, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1349 | Mail Fraud Conspiracy |
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. § 1956(h) | Conspiracy to Engage in Concealment Money Laundering |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

*Complainant's signature*

Darryl Sage, Postal Inspector
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

*Judge's signature*

Date: September 21, 2026

City and state: Detroit, Michigan

Anthony P. Patti- Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A COMPLAINT

I, Darryl Sage, first being duly sworn, hereby depose and state as follows:

1. I am a United States Postal Inspector with the United States Postal Inspection Service (USPIS), authorized to conduct investigations on behalf of the United States Postal Inspection Service, and have been so employed since January 2022. The USPIS is the federal agency charged with investigating violations of criminal and civil statutes related to the United States Postal Service (USPS). Prior to becoming a U.S. Postal Inspector, I was a federal law enforcement officer with U.S. Customs and Border Protection since 2015 and was empowered to exercise the authority and perform the duties provided by law and the Department of Homeland Security regulations, including making arrests; conducting searches; making seizures; bearing firearms; and serving any order, warrant, or other process. This included but was not limited to enforcing violations of Title 18 United States Code, Title 19 United States Code, and Title 8 United States Code. During my employment with USPIS, I have been trained in various criminal investigative techniques involving mail theft, mail fraud, identity theft, credit card fraud, and the distribution of controlled substances. During my career as a Postal Inspector, I have been trained in the execution of various search warrants involving searches and seizures of residences and vehicles. These warrants often include, but

are not limited to, seizures of computers, phones, various electronic devices, narcotics, mail, and weapons.

2. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses and other reliable sources. This affidavit is submitted for the limited purpose of showing that probable cause exists for the requested criminal complaint and arrest warrants and does not set forth all my knowledge about this matter.

3. Based on the facts set forth in this affidavit, there is probable cause to believe that **Alexandre Khomoutov** is conducting a scheme to defraud involving the production and sale of highly-accurate counterfeit coupons for consumer retail goods, the shipping of these coupons through the mail, and the subsequent laundering of the proceeds of this scheme; all in violation of 18 U.S.C. § 1349 (Mail Fraud Conspiracy), 18 U.S.C. § 1341 (Mail Fraud), and 18 U.S.C. § 1956(h) (Conspiracy to Engage in Concealment Money Laundering).

## EXECUTIVE SUMMARY

4. The USPIS and the Internal Revenue Service-Criminal Investigation are investigating The Weekly Coupon Service (WCS), a criminal conspiracy involving the production and sale of highly realistic, but counterfeit, consumer goods coupons with drastically inflated values; the values are so inflated that they

result in a significant loss to product manufacturers and, at times, the stores at which those goods are sold. These coupons are sold and shipped nationwide.

5. Customers of the WCS receive regular solicitation emails, with links directing them to GitHub repositories ("repos"). GitHub is a cloud-based platform where developers store, share, and collaborate on software code. According to GitHub, repos are essentially digital project folders hosted on GitHub that store users' code, files, and their entire version history. They act as a central hub where a user can manage their work and collaborate with others. Of significance to this investigation, despite their backend functionality, repos can be made to appear, outwardly, as basic websites. Here, they present (and function) as e-commerce websites where users can select coupons for purchase and pay for them via PayPal. The GitHub pages hosting these stores have complicated URLs that would be difficult to locate on the internet without a direct hyperlink from one of the solicitation emails. The payment links within the webstores direct users to PayPal accounts with seemingly random two-word names like OutsideTurtle, GoldenChicken, LuxuriantMillenium, LimeModule, etc.

6. Once a visitor selects the coupons they wish to purchase, the visitor provides payment via PayPal. After payment, the visitor receives the fraudulent coupons by mail through the USPS. A third-party industry group has conducted multiple covert purchases of these coupons, sold by the WCS through multiple

GitHub pages. The industry group has been voluntarily providing detailed information about their covert purchases to the investigative team, to assist with identification and prosecution of those responsible. The coupon shipments for many of these covert purchases were mailed from Michigan, with others being shipped from Florida or other states.

7. Working backward from these shipments, law enforcement identified Andrei Zaretski as printing and distributing large quantities of the counterfeit coupons purchased from the WCS, working out of a warehouse in the Southern District of Florida. Zaretski himself then ships them from Florida to re-shippers across the country, including Oleskiy Holikov in the Eastern District of Michigan. The investigation also identified Nikolay Saukov as someone withdrawing money from multiple accounts connected to the WCS—none of which he is an authorized signer on—and then depositing cash into Holikov's bank account.

8. Zaretski, Holikov, and Saukov were all recently charged via criminal complaint filed in the Eastern District of Michigan (26-mj-30531), and Zaretski and Saukov were arrested on September 3, 2026, in the Southern District of Florida.

9. During the execution of search and arrest warrants, additional evidence was discovered and/or corroborated, further implicating **Khomoutov**. Significantly: (1) Beginning in January 2020, banking records show that

**Khomoutov** has received approximately $597,000 in PayPal transfers from accounts tied to the sale of counterfeit coupons (including approximately $250,000 split between two personal accounts, with the remaining funds distributed among multiple "shell" accounts for businesses that otherwise appear to be in-active); (2) **Khomoutov** owns the warehouse from which Zaretski was running the printing operation (and there is no indication that Zaretski has ever paid **Khomoutov** for the use of the building, rather **Khomoutov** has transferred money directly to Zaretski—$15,840 in Zelle payments); (3) a 'beach club' photo ID with **Khomoutov's** name and picture was also found in Zaretski's car at the time of his arrest, alongside a quantity of fraudulent coupons; and (4) in recorded, post-Miranda statements, Saukov stated that **Khomoutov**—who he called "Alex"—was the one who (a) provided him the debit cards he used to make withdrawals from the WCS associated accounts, (b) sent him the checks he was observed depositing, and (c) told him who to send money to, and in what amounts. Further, Saukov advised generally that **Khomoutov** is technologically savvy.

## BACKGROUND

10. The Coupon Information Center (CIC), a not-for-profit association of consumer product manufacturers dedicated to fighting coupon misredemption and fraud in the United States, has been purchasing counterfeit coupons from various sources for years, as part of their efforts to combat fraud. Based on prior purchases

from other sources, CIC received a solicitation via email from The Weekly Coupon Service to purchase coupons via GitHub web links. In addition, various customers who purchased coupons from the WCS notified the CIC after they presented the coupons for redemption at their local retailers and were denied. The CIC would then use the same link the customer provided to make purchases to verify the authenticity of those coupons and other coupons.

11. At least six of these GitHub webstores have been identified over the course of the investigation. The GitHub pages hosting these stores have complicated URLs that would be difficult to locate on the internet without a direct hyperlink from one of the solicitation emails. The payment links within the webstores direct users to PayPal accounts with seemingly random two-word names like OutsideTurtle, GoldenChicken, LuxuriantMillenium, LimeModule, etc.

12. Purchases made by the CIC through the WCS's GitHub webstores were processed through PayPal, with each webstore having its own, separate linked PayPal Account.

13. All coupons purchased from the WCS by the CIC, to date, have been confirmed by the CIC member-companies as being counterfeit/fraudulent.

14. After making purchases from the WCS itself and verifying through its member-companies that the coupons it received were fraudulent, the CIC referred the matter to the USPIS in or around March 2022.

15. Based on my training and experience, the evidence detailed below suggests that **Khomoutov** directed and/or facilitated key components of the fraudulent coupon scheme while attempting to deliberately distancing himself using shell companies and accounts. Specifically, records show that **Khomoutov**, through a business he incorporated, owns the Pembroke Road warehouse used as a production hub for WCS to print and package fraudulent coupons. Financial records show that shell accounts under his control were used to move proceeds, and Saukov specifically stated that **Khomoutov** provided him with debit cards, sent him checks to deposit, and instructed him where and in what amounts to move funds. Financial transfers confirm that **Khomoutov** also funded both Holikov and Zaretski, the individuals responsible for reshipping and printing the fraudulent coupons. Collectively, this evidence links **Khomoutov** to the printing, reshipping, and laundering components of the scheme.

**<u>The Re-Shipper: Oleskiy Holikov</u>**

16. Records from PayPal showed that money from CIC's covert purchases during 2021-2022 was transferred from PayPal to a bank account in the name of "A.G." From the "A.G." bank account money was transferred to Oleksiy Holikov. Financial records also linked Holikov to a rental property on Beauchamp in West Bloomfield, Michigan. Based on the financial transfers received by

Holikov and subsequent investigation, Holikov appears to be a coupon re-shipper for the WCS organization.

17. Postal and investigative records show that fraudulent coupons purchased covertly by CIC entered the U.S. mail stream in Michigan and Florida. In early 2024, mail tracking and surveillance at the Walled Lake, Michigan Post Office revealed multiple parcels matching the appearance and mailing characteristics of CIC's controlled purchases.

18. Investigators repeatedly observed mailings consistent with WCS activity being deposited into USPS collection boxes in Walled Lake. On March 16, 2024, surveillance captured a vehicle depositing multiple prepaid parcels; inside those parcels, sender names matched PayPal accounts used during CIC's undercover purchases.

19. On May 1, 2024, USPS recovered another large batch of similar parcels. Video captured a dark Toyota Camry depositing the mailings, and the driver appeared to be Holikov. One parcel addressed to a CIC undercover account was opened with consent and contained fraudulent coupons purchased from the WCS.

20. Subsequent observations confirmed the same Toyota Camry parked at the Beauchamp Property and law enforcement determined that Holikov's domestic partner was the registered owner of the Camry. Fingerprint analysis of recovered

mailings identified Holikov's prints on multiple envelopes of the sort associated with earlier WCS shipments.

21. In July 2024, investigators identified a FedEx shipment addressed to "Kolo System" at a UPS Store mailbox in Southfield, Michigan. After obtaining a federal search warrant from the Eastern District of Michigan, investigators opened the parcel and found thousands of fraudulent coupons packaged in the same manner as those sold by WCS and previously purchased by CIC. The parcel was returned to the mail stream and later retrieved by Holikov.




22. Further review of FedEx account activity tied to that parcel showed shipments originating primarily from Hollywood, Florida. Surveillance linked

these shipments to a white male frequently driving a BMW, later identified to be Andrei Zaretski.

**The Printer: Andrei Zaretski and the Warehouse in Hollywood, Florida**

23. In December 2024, investigators obtained call tolls of phone numbers belonging to individuals identified in this investigation. These phone numbers were linked to individuals in Michigan and Florida who were associated with PayPal accounts receiving proceeds from the purchase of fraudulent coupons by the CIC, observed mailing fraudulent coupons, and/or residing at the same address as the vehicle that retrieved the UPS parcel containing fraudulent coupons. After receiving the records, investigators generated an analysis identifying the most frequently appearing phone numbers. One such number, when checked through a national database, was found to be associated with a call for service at a property on Pembroke Road in Hollywood, Florida (the Warehouse).

24. Your affiant contacted the Broward County Sheriff's Office in Broward County, Florida, and learned that the call for service at the Warehouse was for an alarm response. During that service call, officers obtained two phone numbers from the alarm company (to reach a keyholder so they could clear the building without forcing entry). The first number, xxx-xxx-9598, subscribed to **Alexandre Khomoutov**, was the one that initially led investigators to the Warehouse. The second number had no name associated with it but was later

connected to Andrei Zaretski using law enforcement databases. Property records revealed that the warehouse was owned by Zetta Test, a business incorporated by **Khomoutov**.

25. In July 2025, investigators conducted surveillance on the Pembroke addresses in Hollywood, Florida. Zaretski was observed walking to Pembroke and spending hours alone inside. During the length of surveillance, Zaretski was never seen going to any other location that suggested regular or routine employment.

26. On or about March 11, 2026, Florida Department of Law Enforcement conducted a trash pull on the can Zaretski set outside the Pembroke Property and located toner for a Xerox printer, a large amount of paper clippings, shipping boxes, blank paper, and other items.

27. Investigators have not identified any rent payments or other transfers (as would be expected in the context of a lease agreement) from Zaretski to **Khomoutov** for use of the building at 4300 Pembroke Road. To date, all known financial transactions show funds flowing *from* **Khomoutov** to Zaretski rather than the reverse—$15,840 in Zelle payments.

28. On September 3, 2026, a search warrant authorized by the Honorable Panayotta Augustin-Birch, U.S. Magistrate Judge for the Southern District of Florida at Fort Lauderdale was executed on the Warehouse. Inside the warehouse your affiant found two commercial printers connected to a computer workstation,

two commercial paper cutters, thousands of suspected-fraudulent coupons (enough to fill roughly thirteen 50-lb bags) sorted by variety, both sitting out on tables and in file-drawers, as well as sheets of uncut coupons still sitting on one of the printers, and large quantities of packaging and shipping materials—including FedEx labels consistent with those identified earlier in the investigation in connection with shipments made to the CIC's undercover account(s). See pictures, below:




SAVE $6.00
SAVE $8.00


SAVE $5.00

29. Also on September 3, 2024, Zaretski was taken into custody by law enforcement in Florida. He had the keys to the Warehouse on his person. An inventory search of his vehicle revealed a quantity of coupons, a $4,000 check made out to one of his businesses (written by Saukov), and an ID for a Beach Club with **Khomoutov's** name and picture. A parallel financial investigation revealed that dues for this beach club are approximately $26,806.04, implying that access to the club is itself a significant perquisite for Zaretski.

**The Money Launderer: Nikolay Saukov**

30. Throughout the investigation, multiple rounds of subpoenas identified more than 100 different PayPal accounts. Subsequent subpoenas for associated bank accounts revealed approximately 15 shell companies that do not appear to have an online presence or conduct any discernible business.

31. On February 20, 2024, Saukov was observed on JP Morgan Chase surveillance conducting three separate ATM withdrawals at a branch in Boca Raton, Florida. During this series of transactions—completed in roughly ten-minutes—Saukov withdrew $500 from each of three separate "shell" accounts linked to the investigation held in the names: AB Trading, Glenview Dental, and Your Home PC (all believed to be controlled by **Khomoutov**, as discussed below). Saukov completed two of the withdrawals at one ATM and then moved to a separate, nearby ATM to conduct the third transaction; while completing these

transactions, Saukov appeared to refer to information on his cell phone. Saukov is not an authorized signer on any of these accounts.

32. Approximately ten minutes after completing the withdrawals at JP Morgan Chase, Saukov was captured on surveillance entering a PNC Bank branch in Boca Raton carrying cash and a pre-filled deposit slip. He approached a teller and deposited $700 into the personal PNC account of Oleksiy Holikov, despite not being an authorized signer on Holikov's account. Before exiting the bank, Saukov placed the transaction receipt on the counter and photographed it with his phone. [Note: when questioned about this post-*Miranda*, Saukov stated he could not recall taking the picture but that he likely sent it to **Khomoutov**.]

33. Approximately six hours later, Holikov was observed on surveillance at a PNC branch in Michigan withdrawing $660 from his account. Holikov presented his PNC debit card, driver's license, and a signed withdrawal slip, all consistent with authorized access.

34. A review of historical activity revealed several additional transactions mirroring this pattern. Cash deposits were made into Holikov's personal PNC account at the Boca Raton PNC branch on January 19, 2024; August 10, 2023; and July 3, 2023, each followed by a withdrawal of similar amounts at PNC branches in Michigan. The deposit slips associated with these transactions displayed distinctive handwriting characteristics, including consistent lettering and

numbering styles as the slips confirmed to be provided by Saukov. This handwriting differed from the signature and writing style observed on Holikov's verified withdrawal slip. In total, seven deposit slips bearing the same unique handwriting were identified, all originating from the Boca Raton PNC branch between June 12, 2023, and February 20, 2024, indicating a recurring pattern of deposits in Florida followed by withdrawals in Michigan.

35. In addition, Saukov was also observed on JP Morgan Chase surveillance between February 8, 2024, and April 22, 2024, making eight separate check deposits into an account of AB Trading, one of the same shell accounts that was involved in the February 20, 2024, withdrawals that lead to the deposit into Holikov's account. These check deposits were made at JP Morgan Chase branches in Boca Raton and involved checks drawn on accounts that received funds from numerous PayPal accounts linked to WCS' GitHub stores. Additional deposits occurring between February 7, 2023, and October 11, 2024, into the AB Trading account (again, believed to be controlled by **Khomoutov**, as discussed below) were not captured on surveillance footage but followed the same deposit pattern. These deposits originated from additional remitters identified in the investigation including Person 2, Person 3, and Business 5. Notably, the account of Person 2 received PayPal transfers from accounts associated with the sale of coupons by

WCS, and Person 3 is the holder of a secondary FedEx account used by Zaretski to send coupons to another re-shipper in a different part of the country.

36. It is further noted that banking activity on accounts linked to Saukov—either where he is an authorized signer or where he is not an authorized signer, but surveillance shows he exercises control—occurred at financial institutions in Illinois until approximately March 2023. After that period, transactions for the same accounts show activity almost exclusively in the Boca Raton area. This shift in transactional activity is consistent with when Saukov relocated to Florida.

37. More recently, bank surveillance footage dated February 3, 2026, shows Saukov continuing his pattern of cash withdrawals at a Wells Fargo branch in Boca Raton, Florida. The footage depicts Saukov completing a $500 withdrawal from a business account registered to Business 6. Saukov is not an authorized signer on that account. Additional surveillance footage from Bank of America on April 28, 2026, and May 14, 2026, shows Saukov making $500 withdrawals from an account in the name of Person 2. Saukov is, again, not an authorized signer on this separate account. Both the accounts for Business 6 and Person 2 have received PayPal deposits associated with the sale of fraudulent coupons.

38. From January 2020 through February 27, 2026, Saukov received a total of $270,321 in PayPal transfers into a bank account at PNC Bank held in the

name of NSA Group, for which Saukov is the sole authorized signatory. These transfers originated from a business PayPal account under the name "Cooperative Module." PayPal records do not list Saukov as the owner of Cooperative Module. The Cooperative Module account is primarily funded by (1) individuals believed to be purchasing large quantities of fraudulent coupons from the WCS and (2) three additional PayPal business accounts associated with GitHub repos: HotJezebel, BlueSulawesi, and AboutWolfe. According to PayPal records, Saukov is not listed as the business owner for any of these entities, either. All three PayPal business accounts have documented customer complaints related to coupon sales and allegations of fraudulent activity.

39. On September 3, 2024, Saukov was taken into custody by law enforcement in Florida. With the assistance of a translator he was given Miranda warnings, waived his right to remain silent, and agreed to be interviewed. Saukov stated that he met **Alexandre Khomoutov** around 2013. Saukov previously drove **Khomoutov** in a limousine or GMC Yukon to work and to the airport, and **Khomoutov** compensated him via PayPal. Saukov said that Khomoutov did something with computers and was technologically savvy, and that he (Saukov) got involved with **Khomoutov's** business dealings after he once overheard him talking about "computer hacking." Saukov confirmed he relocated from Chicago, where **Khomoutov** resides, to Florida in February 2023.

40. Saukov stated that **Khomoutov** physically provided him with debit cards for several bank accounts and directed him to withdraw funds from those accounts. A search of Saukov's residence revealed 18 such debit cards, the vast majority of which were in the names of other persons of interest to the investigation. Saukov further stated he knew Holikov through **Khomoutov** and was instructed by **Khomoutov** to deposit funds into Holikov's personal account. Saukov advised that **Khomoutov** had been a good employer when he was in Chicago, so he did not question why **Khomoutov** directed him to move money through various bank accounts.

41. Saukov also confirmed that **Khomoutov** would send him packages containing checks, and Saukov was instructed to deposit those checks into multiple accounts, though Saukov could not explain why **Khomoutov** did not deposit the checks himself.

42. Between February 2023 and November 2025, Saukov received approximately 52 small packages sent from a FedEx account linked to Zaretski (one Zaretski has used to mail coupons to another re-shipper in a different part of the country) at Saukov's residence in Boca Raton, Florida. However, in-store surveillance shows that the packages themselves were physically shipped by **Khomoutov**. Based on the packages' weight, observations of the type of cardboard envelope(s) used, and post-arrest statements made by Saukov, I believe it is

probable that these packages contained the debit cards, checks, or other negotiable instruments referred to by Saukov in his interview.

43. In addition to depositing funds into Holikov's personal account, Saukov admitted to depositing funds into a PNC account belonging to another business of interest to the investigation. Saukov did not know the listed owner of this business (Business 7). During an authorized search of Saukov's residence, agents recovered pre-filled deposit slips for Holikov, Zaretski, and the accounts of Business 7 and Business 8.

44. In addition to cash deposits, Business 7 received $42,500 via Zelle from bank accounts held by AA Estate Group and Exergia II Corp, both owned by **Khomoutov**. Accounts held by Your Home PC and Universe Alliance, both also believed to be under **Khomoutov's** control, made payments totaling $100,000 to Westside Wireless, an account owned by Holikov.

45. Saukov stated he knew Zaretski through **Khomoutov** but described his relationship with Zaretski as casual. During an inventory search of Zaretski's vehicle (discussed in part, above), agents located an endorsed check made out to Zaretski's business, Aditum Inc. (itself believed to be a shell company), and signed by Saukov. The check was remitted from an account in the name of "xxxx Breckenridge LLC." A residence located on Breckenridge in Ferndale, Michigan was purchased through the Breckenridge LLC, which is owned by Saukov's

business, NSA Group. Saukov stated the residence was transferred to him by **Khomoutov** so that he could oversee its sale. According to Saukov and documents recovered during the search warrant, the residence was recently sold. Significantly, Saukov did not disclose to law enforcement that he had written this check to Zaretski, stating only that Zaretski had been to his house briefly the weekend prior, and that they talked about what it is like to live in South Florida.

**Additional Evidence of Khomoutov's Involvement**

45. Beginning in January 2020, banking records show that **Khomoutov** received approximately $597,000 in PayPal transfers from accounts tied to the sale of counterfeit coupons. These transfers were routed into bank accounts over which **Khomoutov** has demonstrated or directed control, including AB Trading, Russian Souvenirs, Exergia II, Business 5, Business 6, and two personal accounts; the two personal accounts alone received a combined $250,000 in such transfers.

46. The PayPal transfers originated from accounts registered under the names Brawny Serial, B and Bar, Before Alla, Behind Monkey, Good Grams, Street Light Works, and Skillful Ounces. PayPal records do not identify **Khomoutov**, or any known co-conspirators, as the owners of these PayPal accounts, despite the accounts being directly linked to bank accounts **Khomoutov** controls. Investigation into the identities of the PayPal account owners remains

ongoing, but it appears that they are either straw owners or synthetic identities, or a combination of the two.

47. Further, the listed PayPal accounts were funded by *additional* PayPal accounts, some of which have documented customer complaints related to coupon sales and allegations of fraudulent activity. One customer reported, "And another store confiscated my coupons saying they are fraudulent. So I paid for the coupons and I also have to pay store back at full amount . I am getting charged again this is not right. Again I paid for coupons and now I have to pay store as well."

48. One of the identified PayPal accounts that poured funds over into the PayPal accounts that ultimately transferred money to **Khomoutov** was also the recipient of funds from four controlled coupon purchases, and the coupons received during those buys were confirmed to be counterfeit. The below funnel chart is illustrative of the observed flow of funds with the relevant PayPal account names identified:



49. Banking records show that, as of March 2009, accounts held at JPMorgan Chase in the names of AB Trading, Glenview Dental, Your Home PC, Russian Souvenirs, and Universe Alliance listed both **Khomoutov** and another individual, Person 1 as authorized signers. Apart from Universe Alliance, signature cards for these accounts were updated four months later, in July 2009, to reflect only Person 1 as the signatory. Saukov stated that he met Person 1 "a long time ago" through **Khomoutov** but never sees him. Based on this statement and the pattern of financial transfers, investigators believe **Khomoutov** continues to exercise control over these accounts despite the updated signature cards. Based on my training and experience and that of other agents experienced in the investigation of money laundering, this obfuscated ownership structure and the use of tiered PayPal accounts to pour over funds into other, seemingly "shell" accounts are all indicative of concealment money laundering.

50. Overall, the extensive and ongoing financial investigation indicates a coordinated and recurring scheme involving unauthorized withdrawals, structured deposits, interstate fund movement, and transactions connected to multiple individuals and entities tied to the proceeds of fraudulent coupon activity. Further, based on the nature of the transactions, relationships between the involved individuals, and the statements of Saukov, it appears that **Khomoutov** is directing the bulk of the transaction activity.

## CONCLUSION

51. Based on the investigation thus far, including the facts set forth above, your affiant submits that there is probable cause to believe that **Alexandre Khomoutov** did knowingly agree with Andrei Zaretski and Oleskiy Holikov to execute a scheme to defraud numerous CIC member-companies by means of false and fraudulent pretenses. Your affidavit further submits that there is probable cause to believe that **Alexandre Khomoutov** did knowingly agree with **Nikolay Saukov** to launder the proceeds of this scheme through one or more business accounts. Therefore, your affiant believes that probable cause exists that **Alexandre Khomoutov** violated Title 18 U.S.C. § 1341 (Mail Fraud), and Title 18 U.S.C. § 1349 (Mail Fraud Conspiracy); Title 18 U.S.C. § 1956(h) (Conspiracy to Engage in Concealment Money Laundering).

Respectfully submitted,

Darryl Sage
U.S. Postal Inspector
United States Postal Inspection Service

Sworn to before and signed in my presence
or by reliable electronic means,

ANTHONY P. PATTI
UNITED STATES MAGISTRATE JUDGE
September 21, 2026